**UNITED STATES of America, ex rel., Robert A. DURCHOLZ, and Durcholz Excavating and Construction, Inc., Plaintiffs,**

v.

**FKW INCORPORATED, Midwest Dredge & Excavating, Inc., Jeffrey J. Strange, and the United States of America, Defendants.**

No. EV 95–121 C B/H.

United States District Court,
S.D. Indiana,
Evansville Division.

Feb. 25, 1998.

Charles C. Griffith, Johnson Carroll & Griffith, P.C., Evansville, IN, John C. McDonald, Michael D. Tarullo, Schottenstein Zox & Dunn, Columbus, OH, for plaintiffs.

Robert F. Stayman, Ziemer Stayman Weitzel & Shoulders, Evansville, IN, James M. Peters, Monnet Hayes Bullis Thompson & Edwards, Oklahoma City, OK, Jeffrey B. Kolb, Emison Doolittle Kolb & Roellgen, Vincennes, IN, Bradley L. Williams, Ponce D. Tidwell, Ice Miller Donadio & Ryan, Indianapolis, IN, R. Joseph Sher, Senior Trial Counsel, Washington, DC, Marsha C. Massey, Assistant United States Attorney, Indianapolis, IN, Timothy F. Hyland, EFA Midwest, Great Lakes, IL, for defendant.

***ENTRY DENYING PLAINTIFFS' MOTION TO VACATE ORDER SUBSTITUTING THE UNITED STATES AS A PARTY; DEFENDANT STRANGE'S MOTION TO DISMISS; DEFENDANT FKW'S MOTION TO DISMISS; AND, PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT***

BARKER, Chief Judge.

This matter comes before the Court on (1) Plaintiffs' Motion to Vacate the Court's order substituting the United States for Defendant Jeffery J. Strange ("Strange") in Plaintiffs' tortious interference claim; (2) Strange's Motion to Dismiss Plaintiffs' tortious interference and False Claim Act ("FCA") claims as to him; (3) Defendant FKW Inc.'s ("FKW") Motion to Dismiss Plaintiffs' tortious interference and FCA claims as to it; and (4) Plaintiffs' Motion for Partial Summary Judgment on their FCA claims.[1] For

---

**1.** On September 11, 1997, the parties stipulated to the dismissal of Defendant Midwest Dredge and Excavation, Inc.

the following reasons, all of these motions are denied, with the exception of Strange's Motion to Dismiss Plaintiffs' tortious interference claim, which is denied as moot.[2]

## I. BACKGROUND [3]

This case arises out of events which occurred at the Crane Naval Surface Warfare Center ("Crane") in Crane, Indiana, in late 1994 and early 1995. At all material times, Strange was employed by the Navy at Crane as a civilian supervisory contract specialist in the office of the Officer in Charge of Construction ("OICC"). Strange Depo., vol. 1, at 22–24. Strange's immediate supervisors were Lieutenant DeWayne Roby ("Roby"), Assistant Officer in Charge of the OICC, and Commander Larry Laws ("Laws"), Officer in Charge of the OICC. *Id.*, vol 2, at 170. FKW is a private construction company headquartered in Oklahoma City, Oklahoma and was employed as the Job Order Contract ("JOC") manager at Crane.[4] Brian K. Frederick ("Frederick") was FKW's supervisor of operations at Crane in 1994 and 1995. Frederick Depo. at 16.

At issue in the instant case is a project at Crane to clear debris from two sedimentation ponds. The ponds, which were designed to prevent dirt and debris generated by explo-

sives demolition from entering a nearby creek, had filled with sediment, threatening Crane's compliance with environmental regulations. Roby Aff. 8; Hunsicker E–Mail at Strange's Exhibit 4. In the summer of 1994, command personnel at Crane cited this issue as a matter of highest priority. Roby Aff. ¶ 10; Laws Aff. ¶ 31–32. Recognizing the need for an expedited effort to clear the ponds, a consensus developed among Crane officials that the project should be completed through FKW, instead of contracting it out separately. D. Smith Depo. at 77, 81; Roby Depo. at 46; Roby Aff. ¶ 28. It was also agreed that dredging should be used to complete the project because it was quicker than conventional excavation, which was the traditional alternative. Laws Aff. ¶ 41; Hill Aff. ¶¶ 5–7.

Strange was assigned to serve as the contracting officer on the sedimentation ponds project. Strange Depo., vol. 1, at 77. Soon thereafter he contacted the supervisor of the OICC, David Smith, Support Division Director for the Engineering Field Activity, to inquire into possible methods by which the work could be priced and contracted.[5] *Id.*, vol. 1, at 77–78; D. Smith Aff. ¶ 4. Although dredging was the method that the government preferred, using a non-prepriced item

---

**2.** Hereafter, the Court will refer collectively to Relators/Plaintiffs Durcholz and Durcholz Excavating and Construction, Inc. as Plaintiff.

**3.** The Seventh Circuit in *Hindo v. Univ. of Health Sciences/The Chicago Medical School*, 65 F.3d 608 (7th Cir.1995), recognized that FCA cases are usually heavily dependant on their facts. This case is no exception. The Court is therefore compelled to undertake a recitation of the facts of this case in significant detail.

**4.** The JOC manager is a private party hired by the Navy for a term of years for facilities repair, alteration and small construction projects. Laws Aff. ¶ 7–8. The JOC manager and the Navy enter into a general contract and the Navy then issues specific delivery orders to the JOC manager for specific projects that arise. *Id.* at ¶ 10. The delivery order specifies the price of the project, the work to be performed, and either specifies the method to be used or leaves the method to the contractor's discretion. D. Smith Aff. ¶ 9–11. The JOC manager then completes the project either with its own employees or enters into subcontracting arrangements with third parties. Laws Aff. ¶ 12. If it selects a subcontractor, it will usually do so prior to price negotiations with

the Navy in order to insure that its costs are covered. *Id.* ¶ 12.

**5.** Typically, a project by the JOC manager is priced by reference to the government's Unit Price Book ("UPB"). The UPB sets forth specific, pre-set prices for many basic items which the contractor might be called upon to provide during the course of the contract. Plaintiff's Exhibit 2 at 11–13. A task which does not appear in the UPB is referred to as a "non-prepriced" item. Plaintiff's Exhibit 2 at 11. In the instant case, the items and services necessary for conventional excavation had pre-set prices listed in the UPB, while similar items for dredging were non-prepriced.

The Navy policy, as set forth in its 1990 "Job Order Contracting" guide (P–68–B), states that the non-prepriced component of a delivery order should be limited to 10% of the total cost and that the JOC manager should rarely be used for projects in excess of $200,000. Plaintiff's Exhibit 2 at 10–11. However, Smith testified that, by 1994, the aforementioned policy statement no longer accurately reflected Navy custom and practice. D. Smith Aff. ¶ 6.

to support the delivery order would invariably slow the process. Laws Aff. ¶ 21. Smith advised Strange that the delivery order for the project could be issued as a "performance specification" as a way to price the project with conventional excavation ("conventional") line items listed in the UPB, even though the project would be performed by dredging.[6] D. Smith Aff. ¶¶ 8. Indeed, if the delivery order were issued as a performance specification, Smith instructed Strange that he could use line items from the UPB which support *any* method of completing the project. *Id.* ¶¶ 8, 11.

In November 1994, Strange informally requested FKW to submit a proposal on the pond project. Strange Depo. at 134; Frederick Depo. at 27; Plaintiff's Exhibit 3. FKW determined that it would use a subcontractor to perform the project and, on November 28, 1994, Frederick requested bids on the project from potential subcontractors. Plaintiff's Exhibit 3; Frederick Depo. at 39. The request specified that the preferred method of performance was dredging, but Frederick later informed the potential subcontractors that they could submit bids based upon other methods as well. Frederick Depo. at 40; Bex Depo. at 115. FKW's request was transmitted to the potential subcontractors without Strange having seen it at the time. Strange Depo., vol. 1, at 153.

On December 9, 1994, Dale Bex, a civilian employee of the Department of the Navy Public Works Directorate, prepared a government cost estimate for the project in the amount of $373,644.09, which amount he based upon conventional line items from the UPB. Bex Depo. at 115. He based his estimate on the conventional line items because he understood that the delivery order would be issued as a performance specification, whereby any method that *could* complete the project might be used to price it, even if that method were not used. *Id.* at 115. Concurrently, also based upon conventional line items, FKW formulated its own estimate, which turned out to be virtually identical to the government estimate. Frederick Depo. at 58.

On December 11–12, 1994, FKW received bids for the project from various subcontractors, including:

| Contractor | Amount of Bid |
|---|---|
| (1) Durcholz | — $271,700 |
| (2) Hasenour & Sternberg | — $297,000 |
| (3) Midwest Dredging & Excavation | — $369,800 |
| (4) Southwind | — $528,448 |
| (5) Evergreen | — $417,600 |

Frederick Depo. at 59–61. Frederick has testified that Durcholz planned to perform the project either by dredging or conventional excavation, Hasenour & Sternberg would do it by conventional excavating, and Midwest would do it by dredging. *Id.* at 190. At the time, Frederick believed that Strange and Bex knew that the Durcholz bid included dredging, but Strange, Bex and Roby have all testified that they believed Midwest was the lowest bidder for dredging and that Durcholz proposed only to use conventional excavation.[7] *Id.* at 190–91; Strange Depo. at 176–78; Bex Depo. at 71, 112; Roby Depo. at 83. Frederick supplied Strange and Bex with the bid prices, but did not provide any indication of the methodology on which the bids were based. Strange Depo., vol. 1, at 169; Bex Depo. at 54, 59. Indeed, Strange even testified that Frederick told him that he was unsure what method Durcholz planned to use if awarded the project. *Id.* at 176. After being presented with the bid prices, Strange and Bex told Frederick that Midwest was the contractor that they wanted for the project.[8] Frederick Depo. at 61. Despite what most of the relevant parties be-

---

6. A performance specification calls for the completion of a certain objective, but does not specify the method to be used to perform the work. If the delivery order is issued as a performance specification, the government may still express a preference for a particular method, but it cannot require the contractor to use that method. D. Smith Aff. ¶ 9.

7. Notably, Strange knew that Durcholz owned a dredge. Strange Depo., vol 2, at 111.

8. There is a dispute regarding the manner in which Strange and Roby expressed their desire that Midwest be selected. Frederick testified that Roby directed him to select Midwest or never work at Crane again. Frederick Depo. at 188–89. Frederick further testified that Strange repeated Roby's demands to him in a phone conversation. *Id.* at 61, 77. Strange and Roby both dispute Frederick's testimony, maintaining that they never made such a demand. Roby Depo. at 138; Strange Depo., vol. 1, at 89.

lieved at the time, however, Durcholz had in fact submitted the lowest dredging bid on the pond project. Frederick Depo. 59–61.

On December 14, 1994, Strange issued a formal Request for Proposal to FKW without specifying the method by which the project was to be accomplished. Strange's Exhibit 7. Thereafter, on December 21, 1994, Frederick presented Midwest's plan for the project to, among others, Bex, Roby, and Strange, stating that FKW would base its proposal on the Midwest bid.[9] Roby Aff. ¶ 43; Bex Depo. at 59. During the meeting, Roby was shown a sheet containing the bid prices without any indication of the method on which the bids were based. *Id.* at ¶ 44. He was then told, with no objection from Frederick, that the Durcholz and Hasenour & Sternberg bids were for conventional excavation, while the Midwest and Southwind bids were for dredging.[10] *Id.* at ¶ 45; Roby Depo. at 76–84.

The next day, FKW submitted its formal written proposal for the project in the amount of $457,810. Strange's Exhibit 8. FKW priced its proposal by reference to attached conventional line items, but the figure was really based upon Midwest's bid.[11] Strange Depo., vol. 2, at 208; FKW's Response Memorandum at 21. Because the proposal was higher than FKW's original estimate, which was calculated before receiving the subcontractor bids, the number of conventional line items had to be increased to make up for the increase in price. Frederick Depo. at 64. Following Strange's direction, FKW supported the increase in its proposal by adding a conventional line item for a road to be built from the ponds up to the containment site. *Id.* at 64. Since Midwest planned to use dredging, neither the road construction or the other convention line items would actually have to be performed. *Id.* at 64.

On December 22, 1994, a negotiation session was held between FKW's representa-

tives, Frederick and his assistant, Jerry Stomp, and the government's representatives, Strange and Bex. Prior to the session, Bex determined that FKW's proposal was reasonable and, with Roby's approval, Strange and Bex adopted the proposal's figure as the government's pre-negotiation objective. Bex Depo. at 65; Roby Depo. at 95; Strange's Exhibit 9. Since the government and FKW had identical figures in mind, the two sides had nothing to negotiate, and the FKW proposal of $457,810 was accepted. Strange's Exhibit 9; Bex Depo. at 67. Following the negotiation session, Strange wrote a post-negotiation memorandum which stated that non-prepriced items for the project amounted to $2,817. Strange's Exhibit 7; Strange Depo. at 186.

On December 27, 1994, Laws was on holiday leave and Jerry Hill ("Hill"), the Deputy Director of the Public Works Directorate, was acting in his place.[12] Hill Aff. ¶ 9. On that day, Strange completed the delivery order for the project in the amount of $457,810. *Id.* at ¶ 10. Hill, however, instructed him not to issue the order until Hill confirmed that Armstrong, a representative from the office of the Crane Army Ammunition Activity (CAAA), approved of Midwest and the use of dredging, the most expensive method.[13] *Id.* Armstrong gave his approval and, on December 28, 1994, Hill directed the OICC to issue the delivery order. *Id.*; Plaintiff's Exhibit 10.

Strange typed the delivery order onto a standard order form, which contained the statement, "[a]ll work to be performed in accordance with JOC specifications & attached line items." Plaintiff's Exhibit 10. Despite the fact that dredging would be used, the order was priced by attached conventional line items and $3160.61 in non-

---

**9.** It is undisputed that FKW was not required to select the lowest bidder. D. Smith Depo. at 77.

**10.** Roby testified that he could not recall who was the speaker, but that it was either Bex or Strange. Roby Depo. at 76–84.

**11.** The figure represents Midwest's bid multiplied by FKW's cost coefficient of 1.238 percent. Strange Depo. at 160.

**12.** In his usual position, Hill was not Roby or Strange's supervisor. Hill Aff. ¶ 1.

**13.** The CAAA is the office that was actually paying the bill on the project. However, it used the OICC to procure and complete this project.

prepriced items.[14] Plaintiff's Exhibit 10.

Midwest proceeded to perform the project by dredging. On February 16, 1995, FKW sent the government its first invoice with attached conventional line items in support thereof. The government, through Tim Sears [15], refused to pay, stating that the attached line items had not been performed. Frederick Depo. at 121. Frederick then met with Jim Riggins, a supervisory civil engineer for Crane, who told him not to include the line items in the invoices. *Id.* at 123. Roby and Strange both concurred with Riggins' instructions. Strange Depo., vol. 1, at 199–200. Following these instructions, FKW submitted the same invoice with the percentage of work completed and the amount due, but without attached line items.[16] Frederick Depo. at 123. The Navy paid the invoice. *Id.* at 123. The remaining five FKW invoices on the project were submitted and paid in similar fashion. *Id.* at 123–24; Plaintiff's Exhibits 11, 13. Throughout the process, Strange, Roby, and Riggins all knew of FKW's invoice procedure and approved of it. Strange Depo., vol. 1, at 199–200; Roby Aff. ¶¶ 47–48.

Durcholz subsequently commenced this litigation. It is clear that at the heart of this suit is Durcholz's belief that wrongful acts by FKW and Strange foreclosed his chances of being selected as the subcontractor on the pond project, despite having submitted the lowest dredging bid.

## II. THE UNITED STATES WAS PROPERLY SUBSTITUTED FOR DEFENDANT STRANGE

On March 7, 1997, this Court ordered the substitution of the United States in place of Defendant Strange in the third count of the Complaint, in which Plaintiff alleges that Strange tortiously interfered with his business relationship with the United States. Plaintiff now moves to vacate that order, contending that the United States should not have been substituted because Strange was not acting within the scope of his employment when he engaged in the actions giving rise to Plaintiff's claim. Both Strange and the United States maintain that the original order should stand because Plaintiff fails to adequately rebut the Attorney General's Certification that Strange was working within the scope of his employment at the pertinent time.

■ The Federal Employees Liability Reform and Tort Compensation Act of 1988 ("FELA") is a statutory scheme designed to ensure that federal employees are not held personally liable for actions taken in the scope of their employment. 28 U.S.C. § 2679. In order to accomplish that purpose, Congress empowered the Attorney General to certify that an individual defendant was a federal employee acting, at times material to the litigation, within the scope of his employment. *See* 28 U.S.C. § 2679(d). In this case, a Certification of Scope of Employment was made by the Attorney General's designee, Acting Torts Branch Director John L. Euler, providing that "Jeffery Strange, who is named as an individual defendant, was acting within the scope of his employment as an employee of the United States at the time of the conduct alleged in the complaint." March 6, 1997 Notice of Substitution; *see also* 28 U.S.C. § 510 (designee may certify). Although such a Certification is compelling evidence that Strange was acting within the scope of his employment, it is not conclusive. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). A Certification simply establishes a prima facie case, shifting the burden to Plaintiff to show that Strange's conduct was not within the scope of his employment. *See Hamrick v. Franklin*, 931 F.2d 1209, 1211 (7th Cir.1991); *Barry v. Stevenson*, 965 F.Supp. 1220, 1222 (E.D.Wis. 1997).

---

14. If dredging had been used to price the project, the total cost of non-prepriced items listed in the delivery order would have been approximately $369,800. Strange Depo., vol. 1, at 187–88.

15. The parties have not identified Tim Sears' title or position.

16. Frederick acknowledged, however, that submitting invoices without attached line items was "not consistent with [his] understanding of the accepted procedure for Job Order Contract invoices." Frederick Depo. at 123.

■ To determine whether Strange was acting within the scope of his employment, we look to Indiana law on principles of respondeat superior. *See Williams v. United States,* 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955); *Duffy v. United States,* 966 F.2d 307, 314 (7th Cir.1992). "In Indiana, an employee's tortious act may fall within the scope of his employment 'if his purpose was, to an appreciable extent, to further his employer's business.'" *Kemezy v. Peters,* 622 N.E.2d 1296, 1298, 1298 (Ind.1993) *quoting Stropes v. Heritage House Childrens Ctr.,* 547 N.E.2d 244, 247 (Ind.1989). "The test is whether the employee's actions were at least for a time authorized." *Konkle v. Henson,* 672 N.E.2d 450, 456–57 (Ind.Ct.App.1996). That the alleged behavior was willful, wanton, or intentional does not necessarily remove it from the scope of his employment. *Id.; Indiana Department of Correction v. Stagg,* 556 N.E.2d 1338, 1343 (Ind.Ct.App.1990). Indeed, "an employee's wrongful act may still fall within the scope of his employment if his purpose was, to an appreciable extent, to further his employer's business, even if the act was predominantly motivated by an intention to benefit the employee himself." *Stropes,* 547 N.E.2d at 247.

Plaintiff contends in this action that Strange's actions relevant to the tortious interference claim were performed outside his scope of employment, including when he (1) directed FKW to select Midwest for the project or lose future Crane work, (2) advised FKW that it should increase the conventional line items to reflect the increase in its final proposal, (3) concurred in the use of conventional line items, even though the project would be performed by dredging, (4) approved the delivery order containing conventional line items which were not performed and which he knew would not be performed, and (5) directed FKW to submit invoices specifying the percentage of work completed, but containing no line items. Both the United States and Strange respond that the above alleged acts were performed within Strange's scope of employment.

■ As the contract specialist assigned to the pond sedimentation project, Strange was required to consult with Frederick regarding how and who would perform the task. That Strange indicated a preference for a particular subcontractor is clearly within his duties. However, Plaintiff's allegations go further, contending that Strange demanded that FKW select Midwest or face the prospect of being awarded no future work at Crane. Frederick Depo. at 61, 77. Assuming that Strange actually made such a demand, it was made only after Roby, Strange's superior officer, made a similar comment to Frederick in the presence of Strange, implying that the OICC had authority to make such a demand. *Id.* at 188. Roby's demand clearly supplied Strange with the implied authority to make a similar statement to FKW.[17] Furthermore, Plaintiff has failed to establish that the statement was not made pursuant to the best interests of the Navy. Strange's job was to oversee the project and make certain that it is performed properly. Midwest was a qualified bidder whom Strange believed to be the best company for the job. Therefore, a demand that Midwest be selected would have been, at least in part, pursuant to the Navy's best interests.

17. Roby's actions also cloaked Strange with the apparent authority to direct FKW to use Midwest. Indiana law, however, is unclear on whether apparent authority triggers respondeat superior liability in tort actions. *See Dubois v. Kepchar,* 889 F.Supp. 1095 (N.D.Ind.1995) (recognizing lack of clarity). On October 7, 1996, the Indiana Supreme Court granted transfer in *Sword v. NKC Hospitals, Inc.,* 661 N.E.2d 10 (Ind.Ct.App.1996), *transfer granted, opinion vacated,* 10S05–9610–CV–637, which held that Indiana recognized the doctrine of apparent authority in respondeat superior tort liability. As of the date of this entry, the Indiana Supreme Court has not entered a ruling in that case. The majority view is that respondeat superior liability is triggered when an agent's actions are within their actual or apparent authority. *See United States v. One Parcel of Land,* 965 F.2d 311, 319 (7th Cir.1992); RESTATEMENT SECOND OF AGENCY § 267 (1958). Indiana case law suggests that the Indiana Supreme Court will follow this view. *See Hinshaw v. Bd. of Commissioners of Jay County,* 611 N.E.2d 637 (Ind.1993); *Soft Water Utilities, Inc. v. LeFevre,* 159 Ind.App. 529, 308 N.E.2d 395 (1974); *cf. Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.,* 833 F.2d 633, 637 (7th Cir.1987) (applying Indiana law). Thus, Strange's apparent authority also establishes that the statement at issue was made within the scope of his employment.

The other four acts cited by Plaintiff were also within Strange's scope of employment. All four acts were approved by his superior officers and were consistent with his duties to negotiate the contract price, determine the appropriate line item pricing, and approve delivery orders. Moreover, Strange's actions were conducted to facilitate a quicker completion of the pond project, which was clearly in the Navy's best interest.

The Attorney General's Certification that Strange was acting within his scope of employment established a prima facie case that Plaintiff has failed to rebut. Accordingly, Plaintiff's Motion to Vacate Order Substituting the United States for Strange in the third count of the Complaint is hereby DE-NIED.[18] As acknowledged by Plaintiff, the United States has not waived its immunity for actions arising out of interference with contractual relations. Plaintiff's Motion to Vacate at page 4, n. 2; 28 U.S.C. § 2680(k). Therefore, the third count of Plaintiff's Complaint, alleging that Strange tortiously interfered with a business relationship, is DISMISSED.

## III. *DEFENDANTS' MOTIONS TO DISMISS*

### A) MOTION TO DISMISS STANDARDS

Federal Rule of Civil Procedure 12(b)(6) permits the dismissal of a claim for "failure to state a claim upon which relief may be granted." When considering a motion under this rule, the Court must examine the sufficiency of the plaintiff's complaint, not the merits of the lawsuit. *Triad Assocs. v. Chicago Housing Auth.,* 892 F.2d 583, 585 (7th Cir.1989). Dismissal is appropriate only if it appears to a certainty that the plaintiff cannot establish any set of facts which would entitle him to the relief sought. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Mosley v. Klincar,* 947 F.2d 1338, 1339 (7th Cir.1991).

We accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992).

### B) PLAINTIFF'S COMPLAINT STATES FCA CLAIMS WITH PARTICULARITY

Both FKW and Strange move to dismiss Plaintiff's FCA claims, pursuant to Rule 12(b)(6), contending that Plaintiff has failed to set forth the claims with particularity, as required by Federal Rule of Civil Procedure 9(b). Plaintiff rejoins that the FCA claims are sufficiently precise to satisfy the requirements of Rule 9(b).

■ Rule 9(b) requires plaintiffs to plead all averments of fraud with particularity. *See Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 777 (7th Cir.1994). Although the Seventh Circuit has not ruled directly on the applicability of Rule 9(b) to FCA civil suits, it has consistently applied it to other statutory fraud claims. *See General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1079 (7th Cir.1997); *Emery v. American General Finance, Inc.,* 71 F.3d 1343 (7th Cir.1995). Other courts recently addressing the issue have invariably applied Rule 9(b) to FCA civil suits. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997); *Gold v. Morrison–Knudsen Co.,* 68 F.3d 1475, 1477 (2nd Cir.1995); *Luckey v. Baxter Healthcare Corp.,* No. 95–C–509, 1996 WL 242977, *8 (N.D.Ill. May 9, 1996); *United States ex rel. Robinson v. Northrop Corp.,* 149 F.R.D. 142, 144 (N.D.Ill.1993). Consistent with the Seventh Circuit's reasoning in this area and other compelling case law directly on the issue from other circuit courts and district courts within the Seventh

---

**18.** Plaintiff requests an evidentiary hearing on this matter. Although the Supreme Court in *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995), required that district courts allow parties to contest an Attorney General's scope-of-employment certification, it did not require a hearing on the matter. *See id.* Indeed, the Seventh Circuit does not require a hearing when a factual issue need not be resolved. *See Snodgrass v. Jones,* 957 F.2d 482, 487 (7th Cir.1992). In this case, the scope-of-employment issue can be decided without resolving any factual disputes and, therefore, a hearing is unnecessary. Accordingly, Plaintiff's request for an evidentiary hearing on the scope-of-employment issue is DENIED.

Circuit, we hold that Rule 9(b) applies to Plaintiff's FCA claims.

In the Seventh Circuit, a plaintiff may satisfy Rule 9(b) by providing a "general *outline*" of the circumstances constituting the alleged fraud, sufficient to "reasonably notify the defendant[ ] of [its] purported role" in the fraud. *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992). Providing the defendant with "fair notice is 'perhaps the most basic consideration' underlying Rule 9(b)." *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777–78 (7th Cir.1994) *quoting* 5 Wright & Miller, Federal Practice and Procedure § 1298, at 648 (1969). Rule 9(b) was also designed to protect a defendant's reputation from unfair harm, and to minimize "strike suits" and "fishing expeditions." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992).

■ Generally, a complaint for fraud must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Schiffels v. Kemper Fin. Services, Inc.*, 978 F.2d 344, 352 (7th Cir.1992); *see also General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir.1997). These requirements are tempered somewhat where a plaintiff alleging fraud, prior to discovery, does not have access to all the facts necessary to provide details. *See Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996); *Bankers Trust Co. v. Old Republic Ins.*, 959 F.2d 677, 684 (7th Cir.1992).

■ Plaintiff's Complaint sets forth FCA claims against FKW and Strange. Regarding the allegations against FKW, the Complaint clearly states that FKW's act of charging the government $457,811 was fraudulent in that it was not the best value to the government. First Amended Complaint ¶ 13. The Complaint also states that the government solicited and received bids for the project between December 12–22, 1994. *Id.* at ¶ 9. The bidding process was cited as a vehicle for the fraud and Crane was cited as the place the fraud took place. *Id.* at ¶ 12, 14. Although the Complaint did not allege the precise number of times that FKW fraudulently invoiced the Navy on this project, that omission does not violate Rule 9(b) or otherwise compromise Defendants' right to fair notice. Defendants are in possession of such information, and Plaintiff was not required to plead them prior to discovery. *See Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir.1996). Finally, FKW's response to Plaintiff's Motion for Partial Summary Judgment demonstrates that it had fair notice of the basis of the FCA claims against it.

The FCA claim against Strange is also sufficiently particular in providing Strange fair notice of the allegations. The Complaint alleges that Strange directed FKW to use Midwest to perform the project at issue, knowing that doing so would result in an overpayment by the government. First Amended Complaint ¶¶ 24, 28. The Complaint also sets forth the time, place, and nature of Strange's alleged fraud, clearly meeting the particularity requirement. *Id.* at ¶¶ 24–26. Strange has demonstrated an understanding of the basis of the FCA claim against him in his Response to Plaintiff's Motion for Summary Judgment and in his own Motion for Summary Judgment.[19] Accordingly, Defendants' Motions to Dismiss Plaintiffs FCA claims for lack of particularity are DENIED.

## C) PLAINTIFF'S TORTIOUS INTERFERENCE COUNTS STATE CLAIMS

FKW and Strange also move to dismiss Plaintiff's tortious interference with business relationship and/or prospective advantage in business claims, contending that Plaintiff fails to demonstrate both the business relationship and that the defendant acted illegally.[20] Plaintiff rejoins that their complaint

---

**19.** At the time of this Entry, the Court has received Strange's Motion for Summary Judgment. That motion, however, is not fully briefed and is not addressed further in this Entry.

**20.** Strange's motion to dismiss the tortious interference claim is MOOT because, as previously discussed, Strange is no longer a defendant to Plaintiffs tortious interference claim.

sets forth all the necessary elements of the tort.

■ In Indiana, the elements of a cause of action for tortious interference with a business relationship include: (1) the existence of a business relationship, (2) the defendant's knowledge of the existence of the relationship, (3) the defendant's intentional interference in the relationship, (4) the absence of any justification, and (5) damages resulting from the defendant's interference. *See Wright v. Associated Ins. Cos. Inc.,* 29 F.3d 1244, 1252 (7th Cir.1994); *Furno v. Citizens Ins. Co. of America,* 590 N.E.2d 1137, 1140 (Ind.Ct.App.1992). In addition, "it is critical that the defendant acted illegally in achieving his end." *Economation, Inc. v. Automated Conveyor Systems, Inc.,* 694 F.Supp. 553, 556–57 (S.D.Ind.1988) (citations omitted); *see also Wright, supra.; GL Industries of Michigan, Inc. v. Forstmann–Little,* 800 F.Supp. 695, 699 (S.D.Ind.1991) (Barker, J.); *Watson Rural Water Co., Inc. v. Indiana Cities Water Corp.,* 540 N.E.2d 131, 139 (Ind.Ct.App. 1989). However, there is no requirement that a valid contract exist. *See Furno, supra.; Biggs v. Marsh,* 446 N.E.2d 977, 983 (Ind.Ct.App.1983).

■ FKW disputes that the business relationship and illegality elements are alleged in Plaintiff's Complaint. Upon examination of the Complaint, however, we discover that Plaintiff clearly sets forth the existence of a business relationship with the United States. First, Plaintiff states that "Durcholz Co. had performed work at Crane for more than twenty years." First Amended Complaint ¶ 50. Second, Plaintiff alleges that it would have entered into a contract with the government but for FKW's interference. First Amended Complaint ¶ 43. Together, these statements allege that FKW interfered with Plaintiff's business relationship which had existed between itself and the government for over twenty years. This suffices for the tortious interference claim.

FKW's contention that Plaintiff fails to allege the illegality element is also without merit. The bulk of the Complaint is dedicated to allegations that FKW violated the FCA. Plaintiff's tortious interference claim expressly incorporates the remainder of the Complaint, including the allegations that FKW acted illegally in violating the FCA. *Id.* at ¶ 30. Accordingly, FKW's Motion to Dismiss Plaintiff's tortious interference claim is DENIED.

## IV. *PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

### A) SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248; 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med. Ctr. v. American Med. Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994).

In resolving a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movants. *Patel v. Allstate Ins. Co.,* 105 F.3d 365, 366 (7th Cir.1997); *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992). However, we must not "ignore facts in the record merely because they are unfavorable.... [A non-movant] gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question." *Patel,* 105 F.3d at 366. Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989).

### B) DISCUSSION

Plaintiff moves for summary judgment on its FCA claims against Strange, alleging that Strange (1) knowingly submitted a fraudulent delivery order for the project, and (2) con-

spired with FKW to overcharge the government on the project. Plaintiff also moves for summary judgment on its FCA claims against FKW, alleging that FKW (1) knowingly submitted a fraudulent proposal for the project that resulted in the government being overcharged, (2) knowingly submitted fraudulent invoices on the project, and (3) conspired with Strange to overcharge the government on the project. Defendants respond, saying that (1) the claims were not false or fraudulent, (2) even if they were, Defendants did not know it, and (3) the government knew and approved of the claims at issue.

Under the FCA, individuals are authorized to "bring a civil action for a violation of [the Act] for the [complaining] person and for the United States Government." 31 U.S.C. § 3730(b)(1). The action is brought in the name of the government, *id.*, and the government may either intervene and prosecute the action, § 3730(b)(2), or allow the original plaintiff—the qui tam relator [21]—to proceed with the suit under § 3730(b)(4)(B). *See Hughes Aircraft Co. v. United States, ex rel. Schumer*, 520 U.S. 939, ——, 117 S.Ct. 1871, 1874, 138 L.Ed.2d 135 (1997). On May 13, 1996, the government declined to intervene in the instant case, opting to allow Plaintiff to proceed. Plaintiff's Motion for Partial Summary Judgment at 8.

■ The FCA imposes liability on one who "knowingly presents" to the United States government "a false or fraudulent claim for payment." 31 U.S.C. § 3729(a). "No proof of specific intent to defraud is required." 31 U.S.C. § 3729(b); *see also Brooks v. United States*, 64 F.3d 251, 255 (7th Cir.1995). For purposes of this section, "knowingly" means the person (or entity):

(1) had actual knowledge of the falsity of the information at issue;

(2) acted in deliberate ignorance of the truth or falsity of that information; or

(3) acted in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b). "Innocent mistakes or negligence are not actionable under this section." *Hindo v. University of Health Sciences / The Chicago Medical School*, 65 F.3d 608, 613 (7th Cir.1995). In short, the false claim must be a lie. *Wang v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir.1992).

### 1) STRANGE'S ISSUANCE OF THE DELIVERY ORDER

We first address whether Strange's issuance of the delivery order on the project violated the FCA. Plaintiff argues that by attaching conventional line items to the delivery order the claim was made fraudulent because Strange knew that the order would be performed by dredging. Strange rejoins, asserting that (1) the delivery order was issued as a performance specification, thus allowing him to use any method by which the project could be completed as support for the order, (2) even if the order were not a performance specification, he believed the order had been issued as such, and (3) the government knew and approved of the delivery order and the use of dredging to complete the project.

Was the delivery order actually issued as a performance specification? Strange correctly notes that the Navy permits the use of line items supporting any method of performance *if* the delivery order is issued as a performance specification. D.Smith Aff. ¶¶ 8–9. In this case, however, the delivery order was not issued as a performance specification. Instead, it stated: "[a]ll work to be performed in accordance with JOC specifications and attached line items," clearly dictating that the project be performed consistent with the conventional line items attached and not by any other method. Moreover, it is beyond dispute that, at the time the order was issued, Strange knew that the project would be performed by dredging, not conventional excavation.

While the order, therefore, may have been fraudulent, the issue remains whether Strange actually knew it was fraudulent. If Strange believed he was issuing the order as

**21.** The term "qui tam" is derived from a Latin phrase meaning, "who brings the action for the king as well as for himself." William Blackstone, Commentaries on the Law of England 160 (1768).

a performance specification and that using the conventional line items was therefore proper, he lacked the requisite knowledge element under the FCA. *See United States ex rel. Rueter v. Sparks,* 939 F.Supp. 636, 638 (C.D.Ill.1996) *aff'd.* 111 F.3d 133, 1997 WL 151718 (7th Cir.1997) (table) (defendant's subjective good faith belief in the appropriateness of his actions defeats an action under the FCA).

Strange maintains that the phrase instructing the work to be performed in accordance with the attached line items was standard language in the Navy's delivery order forms and that he mistakenly left it in the order at issue. Strange has testified to that fact and Roby has also testified that the language at issue was not intended to be part of the order. Roby Aff. ¶ 47; Strange Depo., vol. 2, at 242.

Events leading up to the issuance of the delivery order support Strange's testimony. From the start, Strange knew that his superior officers wanted the project completed as quickly as possible. Strange was advised by Smith that issuing the delivery order as a performance specification would expedite the process by allowing the project to be priced with conventional line items, even though dredging would be the method used. D.Smith Aff. ¶ 8. Thereafter, on November 23, 1994, this strategy appears to have been adopted in a meeting attended by Laws, Hill, Roby, Strange, and CAAA representatives. In that meeting, the decision was made to proceed with procurement using FKW and the conventional line items, even though everyone agreed that dredging would be the method used. Strange's Aff. in Support of Representation by the Department of Justice ¶ 2(t) (attached to Plaintiffs' Reply Brief as Exhibit 14). Other actions by the Navy also suggest that the order was intended to be issued as a performance specification, including (1) requesting a proposal from FKW without expressing a specific method of performance, (2) formulating the government's estimate supported by conventional line items, (3) advising FKW to support its proposal with conventional line items, and, finally, (4) issuing the delivery order with conventional line items. Strange's Exhibit 7.

Plaintiff presents no evidence that Strange gained anything, personally or otherwise, by failing to issue the order as a performance specification. The Navy undisputedly wanted the work to be performed by dredging and the price of the project had already been approved by the government. Although the delivery order was not issued as a performance specification, whether Strange knew that at the time is a genuine issue of fact properly reserved for the factfinder.

Strange further contends that he did not "knowingly" submit a fraudulent delivery order because his superior officers knew of his actions and knew that the project would be performed by dredging. Plaintiff responds that Strange's superiors were not fully informed, each lacking crucial information.

Courts have long recognized the significance of the government's knowledge in FCA cases. *See United States ex rel. Anderson v. Northern Telecom. Inc.,* 52 F.3d 810, 817 (9th Cir.1995); *United States ex rel. Milam v. Regents of the Univ. of California,* 912 F.Supp. 868, 888–89 (D.Md. 1995). "The knowledge possessed by officials of the United States may be highly relevant. Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." *United States ex rel. Hagood v. Sonoma Cty. Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991). However, most courts have not held the government's knowledge to be an automatic bar to a FCA claim. *See id.; United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1156 (2nd Cir. 1993); *Tyger Construction Co. Inc. v. United States,* 28 Fed.Cl. 35, 59–60 (1993); *but see Boisjoly v. Morton Thiokol, Inc.,* 706 F.Supp. 795, 810 (D.Utah 1988). Instead, the relevance of the government's knowledge is to be determined on a case-by-case basis. *See e.g. United States v. Fiske,* 968 F.Supp. 1347, 1352–53 (E.D.Ark.1997). "The extent and nature of government knowledge may show that the defendant did not 'knowingly' submit a false claim." *Butler, supra* at 321; *see also X Corp. v. Doe,* 816 F.Supp. 1086, 1093–94 (E.D.Vir.1993). Conversely, the government's knowledge may be too incomplete or

come too late in the process to defeat the "knowingly" element. *See United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 442 (E.D.N.Y.1995).

In the instant case, Strange's immediate supervisors, Roby and Laws, knew that the project would be performed by dredging and approved of Strange's use of conventional line items to support the delivery order. To be sure, they were not deceived by the conventional lines items attached to the delivery order.

Plaintiff concedes as much, but alleges that their knowledge of the entire project was incomplete. Specifically, Laws did not know how the delivery order price was arrived at when it was issued. Laws Aff. ¶ 38. Neither Roby nor Laws knew that Durcholz's bid constituted the lowest bid for dredging. Other Navy officials were similarly without information on different aspects of the project. Smith, the supervisor of the OICC, was not told by Strange that the delivery order price was based on Midwest's bid.[22] Hill was told by Strange that the project would be more expensive than anticipated because the Navy had miscalculated a conventional line item regarding rock for construction of a haul road. However, Strange failed to inform Hill that, since the project would be completed by dredging, the haul road would never be built. At the least, this exchange indicates that Hill may not have been fully informed of the situation.

It is unclear whether any single official authorized to act on behalf of the Navy was truly informed of all the pertinent facts surrounding the delivery order. However, many, if not all, of the relevant Navy officials did know and approve of Strange using the conventional line items in the delivery order, even though the work would be performed by dredging. At the least, this evidence creates a genuine issue of material fact concerning whether the government's knowledge was sufficient to allow the conclusion that Strange did not "knowingly" submit a fraud-ulent delivery order, which, of course, forecloses summary judgment on this issue.

## 2) FKW'S SUBMISSION OF INVOICES

Plaintiff also contends that FKW knowingly submitted (1) its first invoice with attached conventional line items which were not performed, and (2) its remaining invoices without any attached line items, in violation of Navy procedure. FKW responds that (1) the invoices were not fraudulent because the delivery order was issued as a performance specification, (2) violating Navy procedure does not amount to fraud, and (3) the government knew that the invoices were for work that had already been performed by dredging.

As previously discussed, the delivery order on the project specifically called for conventional excavation; it was not listed as a performance specification. Accordingly, under applicable governmental regulations, the invoices were not permitted to be supported by any method that could have been used. Rather, JOC contract policy and the delivery order itself required that the invoices be supported by attached line items or non-prepriced items consistent with the method actually performed.

▇▇ The first invoice was false to the extent that it was supported by attached line items which had not been performed, but the falsity of the remaining invoices remains questionable. Those remaining invoices accurately stated the amount due and the percentage of work completed, but failed to follow required procedures by not attaching the performed items. However, a failure to adhere to agency policy, without more, does not necessarily violate the FCA. *See United States ex rel. Hopper v. Anton,* 91 F.3d 1261 (9th Cir.1996); *Hagood v. Sonoma Cty. Water Agency,* 81 F.3d 1465, 1478–79 (9th Cir. 1996). Nor does the "improper interpretation or unauthorized amendment of a contract, without more, ... constitute a false claim for payment." *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d

---

**22.** Although Smith was the supervisor of the OICC, he was stationed at Great Lakes Navel Center in Great Lakes, Illinois. D.Smith Aff. ¶ 3. His job involved advising field offices regarding specific contracts and actions. *Id.* at 4. There is no indication that he normally would have been informed of the particulars of a contract as it proceeded through procurement.

321, 329 (9th Cir.1995). The invoices submitted were for work that FKW had actually performed and for a price previously agreed to by the government.

■ Assuming *arguendo* that the invoices were false, the government's knowledge of the invoices nonetheless precludes summary judgment for Plaintiff. Throughout the project, Navy officials based all of their proposals and orders on conventional line items: the initial proposal to FKW, the final price, and the delivery order. The Navy also directed FKW to do the same and, consistent with the Navy's actions and direction, FKW's first invoice was submitted with attached conventional line items. Plaintiff presents no evidence that the government was deceived by this act or damaged in anyway by it. *See Hindo v. Univ. of Health Sciences/The Chicago Medical School,* 65 F.3d 608, 614 (7th Cir.1995) ("[w]e would be remiss if we failed to notice that the government has not been harmed here"). Nothing suggests that FKW's actions were carried out with "deceit and skullduggery." *Id.* Instead, the evidence demonstrates that FKW simply wanted to be compensated the work that it had performed. Accordingly, Plaintiffs Motion for Summary Judgment on FKW's first invoice is DENIED.

Regarding the remaining invoices, it is undisputed that the Navy, through Riggins, Roby, and Strange, directed FKW to submit these invoices without any line items. Strange Depo., vol. 1, at 199–200; Roby Aff. ¶¶ 48–49. Although Plaintiff contends that some government officials did not know the basis for the project's price, such a fact does not warrant granting Plaintiff summary judgment.

In a case involving similar facts, the Ninth Circuit in *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d 321 (9th Cir.1995), affirmed a directed verdict for the defendant based on the government's knowledge of the false claim. In that case, the defendant falsely reported in its Test Report to the Army that tests of helicopter radios were planned in accordance with the specifications of the systems and the requirements of the Test Plan. *Id.* at 321. The defendant proceeded to deviate significantly from the systems' specifications and the Test Plan's requirements with the knowledge and approval of the Army representatives directly involved with the testing. *Id.* at 328. The Ninth Circuit held that, because the noncomplying tests were known to and approved by the Army, "the only reasonable conclusion is that [the Test Report] was not a 'knowingly' false statement." *Id.*

Similarly, in the instant case, Navy officials directly involved with the project instructed FKW to submit the invoices without line items. Consistent with the reasoning in *Butler,* Plaintiffs Motion for Summary Judgment regarding the invoices without attached line items is DENIED.

### 3) FKW'S PROPOSAL FOR THE PROJECT

Plaintiff also alleges that FKW's proposal for the project was fraudulent because FKW supported it with attached conventional line items when the proposal was actually based on Midwest's bid. FKW concedes that its proposal was based on Midwest's bid, but maintains that it was nonetheless a proper and fair estimate for the project. Moreover, FKW again contends that the Navy instructed it to use conventional line items to support the proposed price.

■ The evidence establishes that the Navy clearly knew that FKW's proposal was based on the Midwest bid. Prior to submitting its proposal, FKW, represented by Frederick, announced that it would be using the Midwest bid as the basis for their proposal at a meeting attended by Bex, Roby, Randy Katter, Bob Holt, and Strange. No one from the Navy objected. In fact, the Navy even based its own proposal on the Midwest bid after determining a reasonable price for the project, on the basis of which it accepted FKW's bid. The fact that FKW's proposal was based on Midwest's bid did not deceive the government and has not been shown to be fraudulent in that fashion. Accordingly, Plaintiffs Motion for Summary Judgment regarding FKW's proposal is DENIED.

#### 4) CONSPIRACY CLAIMS

Plaintiff's final allegation is that Strange and FKW conspired to use Midwest's bid for the base price and then concealed that fact through the use of false and misleading contract documents. Defendants respond that the purpose for basing the project's price on Midwest's bid was to complete the project in a prompt manner.

 Section 3729(a)(3) of the FCA holds conspiracies liable, whose object is "to defraud the government by getting a false or fraudulent claim allowed or paid." To establish an actionable FCA conspiracy, the plaintiff must demonstrate that (1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) one or more conspirators performed any act to effect the object of the conspiracy. *Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 828 (S.D.N.Y.1986) *aff'd.* 817 F.2d 1007 (2nd Cir. 1987); *see also United States v. Murphy,* 937 F.2d 1032, 1038 (6th Cir.1991); *United States ex rel. Sanders v. East Alabama Healthcare Authority,* 953 F.Supp. 1404, 1410 (M.D.Ala. 1996); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D.Fla.1989). An agreement among two or more person is the essence of conspiracy. *Murphy, supra.*

 Plaintiff fails to demonstrate why it is entitled to summary judgment on its conspiracy claim. Based on the evidence presented, a reasonable jury could conclude that the reason for basing the price on the Midwest bid and using conventional line items to support the price was to expedite the project. A reasonable jury could also conclude that the conventional line items were used because Strange and FKW anticipated that the delivery order would be issued as a performance specification. It is undisputed that Strange's superiors sought a quick completion of the project in order to ensure Crane's compliance with environmental regulations. The Midwest bid was determined to be reasonable by the Navy, specifically Bex, and

using that bid would likely facilitate a hastened negotiation process. Laws Aff. ¶ 21. Indeed, Strange has testified that the need for an urgent completion of the project was the reason that the Midwest bid was used as the basis for the project's price tag. This testimony alone creates a genuine issue of material fact as to whether the object of the conspiracy was to defraud the government.

Furthermore, the government knew that the project would be performed by dredging, that the Midwest bid was not the lowest, and that the price was based on the Midwest bid. Roby Depo. at 94. Although Plaintiff contends that the government's knowledge was incomplete, a reasonable jury could conclude that what the government did know was sufficient to rebut Plaintiff's conspiracy claim. If believed, this evidence obviously would defeat a claim that there was any illegal agreement to defraud the government. Accordingly, Plaintiff's Motion for Summary Judgment on his claims that Defendants conspired to defraud the government is DENIED.

#### 5) PLAINTIFF IS NOT ESTOPPED FROM ASSERTING FCA CLAIM AGAINST FKW

FKW alleges that Plaintiff is estopped from asserting liability against FKW, since all of its actions were undertaken at the specific request and direction of the government.

 "Although the traditional view is that equitable estoppel may not be asserted against the government on the same terms as any other litigant, the Supreme Court has left open the question of whether to expand this general principle into a flat rule that estoppel may not lie against the government in any case." *Kennedy v. United States,* 965 F.2d 413, 417 (7th Cir.1992) *citing Heckler v. Community Health Serv.,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). The Seventh Circuit allows a private party to assert equitable estoppel against the government in a very narrow category of cases.[23]

---

23. The same estoppel requirements that apply to the United States also apply to a qui tam plaintiff advancing a FCA claim in the name of the United

States. *See United States ex rel. Fallon v. Accudyne Corp.,* 921 F.Supp. 611, 619 (W.D.Wis. 1995).

*Id.* The proponent of estoppel must first demonstrate that the government's actions constitute "affirmative misconduct." *United States v. Lair*, 854 F.2d 233, 237–38 (7th Cir.1988); *see also Pratte v. N.L.R.B.*, 683 F.2d 1038, 1042–41 (7th Cir.1982). Once this requirement has been met, the proponent must satisfy the following four requirements:

First, the party to be estopped must know the facts. Second, this party must intend that his [or her] conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his [or her] substantial injury.

*United States v. McGaughey*, 977 F.2d 1067, 1074 (7th Cir.1992) (citations omitted).

In this case, while there are substantial doubts raised by the evidence that FKW can satisfy any of these four requirements, at the very least FKW fails to demonstrate that it was ignorant of the facts, as required by the third estoppel element. The evidence demonstrates that FKW was informed of the procedures and regulations related to the procurement and completion of the project. Frederick, FKW's top representative at Crane, testified that he knew that submitting the invoices without attached line items violated procedure. Frederick even knew that the Durcholz bid was for dredging and that it was the lowest bid for that method. FKW's failure to establish its ignorance, coupled with credible evidence to the contrary, dictates that the Court *DENY* FKW's request that Plaintiff be estopped.[24]

### V. *CONCLUSION*

For all the above-explicated reasons, Plaintiffs Motion to Vacate the Court's order substituting the United States for Strange in Plaintiff's tortious interference claim is DENIED because Plaintiff fails to rebut the Attorney General's Certification that Strange was working within his scope of employment at the material time. Since Strange is not a defendant to Plaintiff's tortious interference claim, Strange's Motion to Dismiss the tor-

tious interference claim is denied as MOOT. The tortious interference claim against the United States is DISMISSED because the United States is immune from such claims. FKW's Motion to Dismiss the tortious interference claim against it is DENIED because the Complaint alleges all the necessary legal elements of the tort claim. Strange and FKW's Motions to Dismiss the FCA claims for lack of particularity are DENIED because the Complaint sets forth those claims with sufficient particularity to satisfy Rule 9(b). Plaintiff's Motion for Partial Summary Judgment is DENIED because Plaintiff fails to establish that there are no genuine issues of material fact that (1) Strange "knowingly" issued the delivery order with the requirement that conventional excavation be performed; (2) FKW's invoices without conventional line items were fraudulent; (3) FKW "knowingly" submitted the invoices fraudulently; (4) FKW's proposal was fraudulent; (5) FKW "knowingly" submitted the proposal fraudulently; and (6) FKW and Strange conspired to defraud the government. FKW's request that Plaintiff be estopped from asserting his FCA against FKW is also DENIED because FKW fails to establish the necessary legal elements to prevail on a claim of estoppel.

---

**24.** Moreover, genuine issues of material fact exist, including (1) whether the government knew the relevant facts, and (2) whether the govern-

ment engaged in "affirmative misconduct" by ordering FKW to use Midwest or else lose future Crane business.